[Cite as *Wuich v. Wuich*, 2013-Ohio-956.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

JEFFREY WUICH                        :

     Plaintiff-Appellant           :   C.A. CASE NO.   25481

v.                               :   T.C. NO.   07DR1399

JULIE WUICH                     :   (Civil appeal from Common
                                        Pleas Court, Domestic Relations)

     Defendant-Appellee      :

                               :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    15th    day of    March   , 2013.

. . . . . . . . . .

JEFFREY WUICH, 2815 Fence Stone Court, Centerville, Ohio 45458
     Plaintiff-Appellant

JULIE WUICH, 9630 Meadow Woods Lane, Centerville, Ohio 45458
     Defendant-Appellee

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**    This matter is before the Court on the Notice of Appeal of Jeffrey Wuich,

filed November 16, 2012. Jeffrey and Julie Wuich were granted a divorce on October 20, 2009, and Jeffrey appeals from the October 18, 2012 decision of the domestic relations court which terminated the parties' shared parenting plan, designated Julie as the residential parent and legal custodian of the parties' three minor children, increased Jeffrey's parenting time, and decreased his child support obligation. We note that Julie did not file a response.

{¶ 2} The parties were married on September 11, 1993, in Centerville, Ohio, and Jeffery filed his complaint for divorce on December 13, 2007. On October 20, 2009, in addition to the Final Judgment and Decree of Divorce, the court issued a Final Decree of Shared Parenting, in which it adopted the joint shared parenting plan proposed by the parties. Pursuant to the plan, Jeffrey's Centerville residence was designated as the children's primary residence.

{¶ 3} On November 9, 2009, Julie filed a motion for an order directing Jeffrey to show cause why he should not be held in contempt for failure to pay child support. An Agreed Order and Entry was filed on December 14, 2009, following a hearing, pursuant to which Jeffrey was ordered to pay child support in the amount of $477.00 per month, per child.

{¶ 4} On January 5, 2011, Jeffrey filed a Motion and Notice to Modify Shared Parenting Plan, in which he requested additional parenting time and a reduction in his child support obligation. On January 7, 2011, the court issued an Order Scheduling Mediation. On February 23, 2011, Jeffrey filed a Motion to Modify Custody, Parental Rights & Responsibilities; Allocation of Tax Dependency Exemption; Child Support; Dependent Health Care Order, Terminate Shared Parenting Plan; and other Relief. On March 15, 2011,

Julie filed a motion requesting termination of the shared parenting plan and also requesting that she be designated as the sole residential and legal custodian of the minor children. The court appointed a guardian ad litem. On October 18, 2011, the magistrate granted the motion of counsel for Jeffrey to withdraw from the case, and on November 16, 2011, Jeffrey filed a Notification of pro se Litigation.

{¶ 5} A hearing on the above motions was held on November 21, 2011, after attempts at settlement failed, and thereafter the parties filed written closing arguments at the magistrate's request. At the start of the hearing, Jeffrey withdrew his motion to terminate the shared parenting plan. He described his relationships with each of his children in detail. Jeffrey stated that his annual income is $104,550.00, and he provided documentation regarding his marginal health care costs. He stated that he wanted his parenting time to be equal to Julie's. He stated that he is concerned about the way in which Julie spends his child support payments. Jeffrey stated that he did not have any personal knowledge regarding Julie's income from the Main Street Hair Salon, which she owns. Jeffrey stated that Julie only works three days a week and is able to work five days a week. Jeffrey presented a proposed shared parenting plan to the court as Exhibit 1. He stated that the distance between his home and Julie's is 2.82 miles. Jeffrey submitted multiple emails between himself and Julie which he asserted demonstrate that Julie is "a habitual liar." He testified that Julie "is always pawning the kids off on someone else," and he asked for a "right of refusal" when Julie is not available to take care of the children. We note that in the course of his testimony, he repeatedly attempted to introduce evidence relating to events the occurred prior to the date of the parties' divorce.

{¶ 6}    On cross-examination, Jeffrey stated that he was prescribed antidepressants for depression from October, 2009 until March, 2011. He stated that his former girlfriend, Elizabeth O'Shea, moved into his home in November, 2010, along with her two children, and that she moved out in mid June of 2011.  Jeffrey stated that he believed that he and Julie can execute a shared parenting plan.   He stated that he and Julie "do communicate but we are not on the best of terms right now.   We are - - we have been working on that.   And then every now and then a new hot button issue will come up and so we make progress and then we fall back."   He stated for example that they had a dispute over their daughter C.W.'s volleyball fees.  He stated that he agreed that C.W. should play volleyball, but he refused to pay for any part of the expense, citing the amount of child support Julie receives. Jeffrey identified text messages and email exchanges between the parties that reflect an inability to communicate on issues involving the children.

{¶ 7}    Geri Anderson testified that she was employed as a secretary at Primary Village South in Centerville, where the parties' son W.W.  attended school.   She stated that on seven occasions she had to phone Jeffrey to come pick up W.W.  after he failed to do so at the end of the school day.  Geri stated that Jeffrey's failure to pick up W.W. on time was upsetting to the child.

{¶ 8}    Julie testified as follows regarding Jeffrey's girlfriend Elizabeth:

Q.  First off, did, how did you become aware that she had moved in? Was it something Jeff called and told you, hey, by the way, here's what's going to be happening in our kids' lives or how did you find out?

A. [W.W.], who was six at the time, came home and told me that dad's girlfriend Elizabeth was moving in and so are her two kids and the two

dogs.

And so I called Jeff, * * * and asked him if that was true.

And he said, yes. * * * he went on to say how he thought everything was going to be so wonderful and he was giving them something I could never do which was a complete family with two dogs.

And I asked him at that time if you were going to make life changes that involve the children don't you think that you should be up front with me about that.

And he didn't seem to think that my complaint was valid.

{¶ 9} Julie stated that on Christmas Eve, 2011, the parties' daughter C.W. called her from Jeffrey's home, but she was unable to understand her because the child was crying. She stated that C.W. then put the parties' son L.W. on the phone, who told Julie that the children were hiding in C.W.'s room because Jeffrey and Elizabeth were fighting. Julie stated that she went to Jeffrey's home and picked up the children, and all three were crying. Julie stated that she believes the home she provides is more stable than Jeffrey's. Julie described the parties' communication as "poor at best."

{¶ 10} Julie and Jeffrey jointly owned the Main Street Salon during their marriage, and she is now the owner and also a stylist there. She stated that on Mondays she does office work at "random" hours, she works Tuesdays from nine a.m. to five p.m., Wednesdays from nine to 4:30. p.m., Thursdays from nine a.m. to eight p.m., and then randomly on Fridays and Saturdays for clients that she could not schedule during the week. She stated that she also cleans the salon and handles maintenance and personnel issues. She

stated that she receives a paycheck as well as "K-1 Income." Julie stated that she makes a base salary of $44,117.00. She stated that in 2008, she made an additional $18,880.00 in K-1 income, in 2009, she made an additional $37,166.00 in K-1 income, and that in 2010, she made an additional $11,311.00 in K-1 income. Julie stated that her K-1 income for 2011 is zero. Julie stated that her business has slowed down, that she lost four employees a year ago, and that as a result she lost about $17,000.00 a year in "booth rent." She stated that she has not "had the retail sales that we've typically had." On cross-examination, Julie stated that she works 40 hours a week three weeks out of a month. She stated that the recession impacted her business.

{¶ 11} The magistrate, after reviewing the report of the G.A.L., noted that despite allegations by Julie of mental health issues on the part of Jeffrey at the time of the divorce, the parties entered into a shared parenting plan that they determined was in the best interest of the children, and at issue was whether that plan remained in the children's best interest. The magistrate found, based on the evidence presented, that neither Jeffrey's nor Julie's mental health is at issue, and the magistrate noted that "the only evidence considered by this magistrate is the evidence after the filing of the divorce." Regarding the shared parenting plan, the magistrate concluded that "both parties have an inability to communicate with each other. When they are forced to communicate, the parties do not communicate effectively. These parents cannot co-parent. The parents cannot cooperate and make decisions jointly regarding these children." The magistrate concluded that the shared parenting plan is not in the children's best interest. Regarding the allocation of parental rights and responsibilities, the magistrate noted that Jeffrey orally withdrew his motion seeking custody at the hearing,

and after citing the factors in R.C. 3109.04(F)(1) regarding the best interest of a child, and the factors in R.C. 3109.04(F)(2) for determining whether shared parenting is in a child's best interest, the magistrate designated Julie as the residential parent and legal custodian of the children.

{¶ 12}  Regarding parenting time, the magistrate again indicated that "the focus is on the evidence presented at this hearing and those events that have occurred after the filing of the" Final Decree.   The magistrate noted as follows:

From the evidence presented at the hearing, both of the parents have a love for their children.  The father believes that he has a special relationship with each of his children.  At some point he has been a coach or assistant coach when each child has participated in a sport.  Each parent has spent as much time as possible with the children.  The father has some concern because he believes that the children are sometimes left alone.

Given the family dynamics, it is in the best interest of the child for the defendant to have an extended parenting time schedule at this time.  In reaching this finding, the magistrate has reviewed case law, R.C. 3109.051 and the evidence presented.  For purposes of the parties' schedule, Thursdays will be used as the father's weekday since the mother has evening appointments.

{¶ 13}  The magistrate then ordered the parties to follow the Standard Order of Parenting Time, with the following exceptions: Jeffrey was awarded parenting time on Thursdays after school until the next morning when he returns the children either to school

or to Julie's residence at 5:00 p.m.; Jeffrey was awarded parenting time on alternating Fridays after school until Monday morning when he returns the children to school or to Julie's residence at 5:00 p.m.

{¶ 14} Regarding child support, the magistrate noted that the current order of support is $477.00 per child per month. The magistrate noted that Jeffrey is employed at P.E. Systems, earning a base salary of $104,500.00, and that in 2010 he received overtime in the amount of $4,758.00. The magistrate noted that Jeffrey's "annual medical dependant coverage is $2,390.40" and he "pays dependent costs of $186.36," such that his "total marginal health care costs are $2,576.76." The magistrate further noted that Julie is employed at the Main Street Salon, earning a combination of W-2 wages and self-employment income, such that for 2010, her "wages were $44,117.00, $161.00 refund, and $11,311.00 self employment for a total income of $55,000.00."

{¶ 15} After reviewing the attached child support computation worksheet, the magistrate noted that "child support at guideline amount pursuant to O.R.C. § 3119.022 is $445.00 per month per child for 3 children." The magistrate found that there "will not be a change in the amount of child support ordered as there has not been a 10% change from the current order of child support," and the magistrate ordered that the current order remain in effect. Finally, the magistrate found that the "cash medical support amount pursuant to the basic child schedule is just, reasonable, appropriate and in the best interest of the children."

{¶ 16} On May 8, 2012, Jeffrey filed pro se objections to the magistrate's decision. Jeffrey enumerated four "requests," namely: (1) "to be an equal, legal custodian of his three children," in reliance upon R.C. 3109.03, (2) that he be provided "information from the

Montgomery County Domestic Relations Court for the past ten (10) years that shows which parent received legal custody of, and place of residence for, the children by gender, race and income level," (3) "to decrease child support and to deviate downward from the child support guidelines because of additional parenting time and expenses * * * as well as the adverse impact the child support payments has had on him and his children * * * and the increased amount of time spent with Plaintiff granted per Standard Order of Parenting Time," and (4) "verification that the Disney Time Share has been placed in the Defendant's name, in accordance with the Divorce Decree * * * or the Plaintiff is granted the right to sell the Disney Time Share."   Jeffrey also sought attorney fees.

{¶ 17}  Julie filed objections on May 17, 2012, asserting that the Magistrate's decision awarding Jeffrey parenting time pursuant to the Standard Order and awarding Jeffrey parenting time overnight on the Sundays of his alternating weekends was an abuse of discretion and not in the children's best interest.  Jeffrey supplemented his objections on June 27, 2012, and he repeated the "requests" set forth above. Julie supplemented her objections on July 11, 2012.

{¶ 18}   The domestic relations court determined initially that Jeffrey's "reliance upon  R.C. 3109.03 as authority to designate him as 'equal legal custodian' of the minor children is misplaced."  The court noted that R.C. 3109.04, and specifically the factors set forth in sections (F)(1) and (2), govern the modification of an order pertaining to the allocation of parental rights and responsibilities.  The court then found as follows:

> The parents' ability to cooperate and make joint decisions is a
> significant factor when deciding if shared parenting is in the best interest of

the children. The [G.A.L.] submitted an initial report * * * on July 26, 2011 and supplemented the report * * * on November 16, 2011. In the initial report, the GAL stated: "During the interview with the Guardian, Father stated that although communication between he (sic) and Mother was 'non-existent' he believed it was unnecessary to vacate their shared parenting plan but was merely requesting the parenting time be modified to allow a 50/50 split with the children." * * * The GAL then reported that defendant had indicated the parties' communication was non-existent. * * * The GAL concluded that the parties do not communicate effectively and that shared parenting "is simply not an option." * * * The GAL recommended that the shared parenting was no longer in the best interest of the children. * * *

In the second report, the GAL reported that both parties acknowledge their communications regarding the children had improved somewhat. * * * Nevertheless, the GAL referred to the "animosity between the parents" still existed. (Sic) He further commented that the children did not wish to spend the Sunday overnights at plaintiff's home because it would interfere with a longstanding Sunday evening meal tradition and disrupt their preparation for school on Monday morning. * * *

At the November 21, 2010 hearing, defendant testified that it was in the children's best interest to terminate the share[d] parenting and designate her as the custodial parent. * * *

* * *

Plaintiff testified that he was requesting modification of shared parenting to reflect a 50/50 arrangement. He proposed defendant have the children Monday and Tuesday and he would have them Wednesday and Thursday. They would alternate the balance of the time each week. * * *

{¶ 19} The court next found that termination of the parties' shared parenting plan is in the best interest of the children, and it designated Julie the residential parent and legal custodian. After noting the children's concerns as expressed in the GAL report regarding their traditional Sunday dinner, as well as the GAL's recommendation that the court should consider granting Jeffrey one additional overnight visitation with the children, the court overruled Julie's objection to the additional Sunday night parenting time. Regarding child support, the court concluded that a five percent reduction in Jeffrey's obligation is "a fair and reasonable adjustment for the additional Sunday night overnight parenting time." The court reduced Jeffrey's obligation to $423.00 per month per child.

{¶ 20} We initially note that Jeffrey's pro se brief does not comply with the requirements of Rule 16 of the Ohio Rules of Appellate Procedure, which provides that an appellate brief must contain a statement of the assignments of error presented for review, with reference to the place in the record where each error is reflected, as well as a statement of the issues presented for review. Instead, Jeffrey's brief is divided into the following subheadings:

Judge Denise L. Cross - Decision and Judgment - October 18th, 2012

And,

Gender, Bias, Prejudice and Discrimination

And,

Unwillingness of the Defendant (Mother) to Cooperate with Plaintiff (Father)

And,

Magistrate Annette McGee Wright - Magistrate Decision and Permanent Order
April 25th, 2012

And,

Ohio Revised Codes that were not fully considered by Magistrate Annette McGee
Wright, or Judge Denise L. Cross

And,

Child Support Computation Worksheet

And,

Motion Filed that was not Addressed in Magistrate McGee Wright's Ruling, or Judge
Denise L. Cross' Ruling

And,

Loss of Personal Property

And,

Behavior of the Attorneys

And,

State of Ohio Task Force on Family Law and Children

{¶ 21} Under Jeffrey's first three subheadings, he asserts that he was subjected to gender bias, prejudice and discrimination "during the divorce proceedings." He asserts that in Montgomery County, all "the Mother has to do is be unwilling to cooperate and the Father does not have a chance of having equal custody of his children. This is not equal status for both parents as they appear before the court, it is not a level playing field for both parents."

Jeffrey asserts that the parties' attempt at mediation failed due to Julie's "unwillingness to put forth a good faith effort." Jeffrey asserts that he "argued a very reasonable position of shared parenting" at the hearing. Jeffrey directs our attention to R.C. 3109.03, and he asserts he was denied due process of law.

**{¶ 22}** We initially note, in "accordance with Civ.R. 53, the trial court must conduct an independent review of the facts and conclusions contained in the magistrate's report and enter its own judgment. * * * Thus, the trial court's standard of review is de novo." *In re D. E. W.*, 2d Dist. Miami No. 2009 CA 2, 2009-Ohio-4116, ¶ 18. Further, claims "of trial court error must be based on the actions taken by the trial court, rather than the magistrate's findings or proposed decision. When an appellate court reviews a trial court's adoption of a magistrate's decision, it uses an abuse of discretion standard." *Id.*

**{¶ 23}** R.C. 3109.03 provides:

When husband and wife * * * are divorced, and the question as to the parental rights and responsibilities for the care of their children and the place of residence and legal custodian of their children is brought before a court of competent jurisdiction, they shall stand upon an equality as to the parental rights and responsibilities for the care of their children and the place of residence and legal custodian of their children, so far as parenthood is involved.

**{¶ 24}** R.C. 3109.04 (B)(1) provides: " When making the allocation of the parental rights and responsibilities for the care of the children under this section in an original proceeding or in any proceeding for modification of a prior order of the court making the

allocation, the court shall take into account that which would be in the best interest of the children."

{¶ 25} R.C. 3109.04(F) provides:

(1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with

the child's parents, siblings, and

any other person who may

significantly affect the child's

best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared

parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

(2) In determining whether shared parenting is in the best interest of the children, the court shall consider all relevant factors, including, but not limited to, the factors enumerated in division (F)(1) of this section, the factors enumerated in section 3119.23 of the Revised Code, and all of the following factors:

(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;

(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;

(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;

(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;

(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.

(3) When allocating parental rights and responsibilities for the care of children, the court shall not give preference to a parent because of that parent's financial status or condition.

**{¶ 26}** As previously noted, the "discretion which a trial court enjoys in custody matters should be afforded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. * * * Thus, a reviewing court may not reverse a custody determination unless the trial court has abused its discretion." *Beismann v. Beismann*, 2d Dist. Montgomery No. 22323, 2008-Ohio-984, ¶ 20.

**{¶ 27}** As the Supreme Court of Ohio determined:

"Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. (Internal citation omitted). It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result. *AAAA Enterprises, Inc. v. River Place Community Redevelopment*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

**{¶ 28}** In *Ohio Valley Radiology Assocs., Inc. v. Ohio Valley Hospital Assoc.*, 28 Ohio St.3d 118, 124-25, 502 N.E.2d 599 (1986), the Supreme Court of Ohio noted as follows:

The United States Supreme Court has held that "[t]he fundamental

requisite of due process of law is the opportunity to be heard." (Internal citations omitted). The court has also held that: "An elementary and fundamental requirement of due process in any proceeding * * * is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. * * * ." (Internal citations omitted).

Both the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution guarantee due process of law, and thus guarantee "a reasonable opportunity to be heard after a reasonable notice of such hearing." * * *.

{¶ 29} We initially note that several of Jeffrey's assertions are directed to events that occurred in the course of the parties' divorce, and they are not properly before us. We will only address his assertions that the court erred in terminating the parties' shared parenting plan and designating Julie as the residential parent and legal custodian, and that he was denied due process of law.

{¶ 30} By its plain language, R.C. 3109.03 recognizes no distinction between the rights of a father and those of a mother to the custody of their children. R.C. 3109.04(F), however, requires that the court determine the children's best interest in allocating parental rights and responsibilities. In other words, R.C. 3109.03 does not require the court to allocate parental responsibilities equally if doing so is not in the children's best interest. It is clear from the record that the parties are unable to cooperate and make decisions jointly with respect to their children, and they conceded at the hearing that they were unable to

communicate with each other. Their inability to communicate, pursuant to R.C. 3109.04(F)(2)(a), was of primary significance to the court in terminating their shared parenting plan, and we find that an abuse of discretion is not demonstrated.

{¶ 31} Finally, the record reflects that Jeffrey received proper notice and an opportunity to be heard on the issue of custody; he was given ample opportunity to present evidence and to cross-examine witnesses. We see no due process violation.

{¶ 32} In his fourth subheading, Jeffrey directs our attention to the following exchange in the course of his direct testimony before the magistrate, in which he sought to introduce his proposed shared parenting plan.

THE PLAINTIFF: It was my understanding that reading through the Ohio Revised Code that each parent was to submit a shared parenting plan for consideration by the court.

THE COURT: * * * So you want me to consider this as your shared parenting plan.

THE PLAINTIFF: Correct.

THE COURT: Let's leave out what the code is; that's my job to interpret that.

{¶ 33} Jeffrey asserts that he was "denied the opportunity from that point forward to specifically state which sections from the Ohio Revised Code he believed were applicable to this case, which sections of the Ohio Revised Code he would have requested be taken into consideration by the court and ruled upon." As noted above, R.C. 3109.04(F)(1) and (2) set forth the factors that the court "shall" consider. In other words, the court was required to

consider all relevant factors. Further, as indicated above, claims of trial court error must be based on the actions taken by the trial court, and not the magistrate.

{¶ 34} Jeffrey also asserts in his fourth subheading that the court reporter omitted certain comments by the magistrate from the transcript, and that the omitted remarks demonstrate that the magistrate's "mind was already made up prior to the completion of the hearing." Jeffrey failed to comply with App.R. 9(E), and our review of Jeffrey's appeal is limited to the record before us.

{¶ 35} In his fifth subheading, Jeffrey initially directs our attention to R.C. 3109.04 (F)(2)(d), and he asserts that Julie and her boyfriend, John Bobo, purchased a home in Washington Township where they have resided since April 6, 2012. According to Jeffrey, the distance between the parties' homes is now 1.5 miles and no longer 2.8 miles. Again, our review of the matter herein is limited to the record before us.

{¶ 36} Jeffrey's remaining arguments under this and the following subheading are addressed to his child support obligation. Jeffrey initially directs our attention to R.C. 3119.04, which provides as follows:

> If the combined gross income of both parties is greater than one hundred fifty thousand dollars per year, the court, with respect to a child support order, * * * shall determine the amount of the obligor's child support obligation on a case-by-case basis and shall consider the needs and the standard of living of the children who are the subject of the child support order and of the parents. The court * * * shall compute a basic combined child support obligation that is no less than the obligation that would have

been computed under the basic child support schedule and applicable worksheet for a combined gross income of one hundred fifty thousand dollars, unless the court * * * determines that it would be unjust or inappropriate and would not be in the best interest of the child, obligor, or obligee to order that amount. If the court or agency makes such a determination, it shall enter in the journal the figure, determination, and findings.

{¶ 37} Jeffrey next directs our attention to R.C. 3119.22, which also allows for a deviation in child support and provides as follows:

The court may order an amount of child support that deviates from the amount of child support that would otherwise result from the use of the basic child support schedule and the applicable worksheet, through the line establishing the actual annual obligation, if, after considering the factors and criteria set forth in section 3119.23 of the Revised Code, the court determines that the amount calculated pursuant to the basic child support schedule and the applicable worksheet, through the line establishing the actual annual obligation, would be unjust or inappropriate and would not be in the best interest of the child.

{¶ 38} R.C. 3119.23 sets forth the factors the court may consider "in determining whether to grant a deviation pursuant to section 3119.22 of the Revised Code," and Jeffrey directs our attention to R.C. 3119.23 (H),(J), and (L), which set forth the following factors as follows:

(H) Benefits that either parent receives from remarriage or sharing living expenses with another person;

* * *

(J) Significant in-kind contributions from a parent, including, but not limited to, direct payment for lessons, sports equipment, schooling, or clothing;

* * *

(L) The standard of living and circumstances of each parent and the standard of living the child would have enjoyed had the marriage continued or had the parents been married.

**{¶ 39}** As noted above, Jeffrey's arguments regarding Julie's cohabitation with John Bobo are not properly before us, since the alleged relocation occurred after the hearing on the parties' motions.

**{¶ 40}** As previously noted, a "'trial court's decision regarding child support obligations falls within the discretion of the trial court and will not be disturbed absent a showing of an abuse of discretion.'" *Johnson v. McConnell*, 2d Dist. Montgomery No. 24115, 2010-Ohio-5900, ¶ 13. Further, in "'any action in which a court child support order is issued or modified * * *, the court * * *shall calculate the amount of the obligor's child support obligation in accordance with the basic child support schedule, the applicable worksheet, and the other provisions of sections 3119.02 to 3119.24 of the Revised Code.' R.C. 3119.02." *Id.*, ¶ 14. In *Johnson* this Court further noted that the Ohio Supreme Court "has required strict compliance with the statutory procedures for an initial award or

modification of a child support order. * * * 'The trial court must include the worksheet in the record so that an appellate court can meaningfully review the trial court's order.' * * *." *Id.* "Generally, the amount of child support that would be payable under a child support order, as calculated pursuant to the basic child support schedule and applicable worksheet through the line establishing the actual annual obligation, is rebuttably presumed to be the correct amount of child support due. R.C. 3119.03." *Id.*, ¶ 15.

{¶ 41} The child support worksheet attached to the decision of the trial court reflects at line 27(a) a 5% downward deviation in the amount of Jeffrey's child support obligation, and the court noted that the deviation represented "a fair and reasonable adjustment for the additional Sunday overnight parenting time." R.C. 3119.23(D) provides that the court may consider "[e]xtended parenting time or extraordinary costs associated with parenting time" in determining whether to grant a deviation pursuant to R.C. 4119.22, and the court properly did so in reducing Jeffrey's monthly obligation.

{¶ 42} In his next subheading, Jeffrey contests the amount of Julie's self-employment income, in the amount of $11,472.00, as reflected on line 6 of the child support computation worksheet. He asserts that the "dramatic decline in the profits of the salon in 2010 is either a lie to protect the current level of child support, or is a strong indication of the Defendant's lack of financial responsibility." He asserts that the court should have averaged Julie's self-employment income for 2008, 2009, and 2010.

{¶ 43} Julie testified that she lost four employees, that the recession had an adverse impact on her business, and that her retail sales of hair care products were diminished. The

worksheet identifies Julie's 2010 Individual Income Tax Return, which was admitted into evidence and which reflects self-employment income in the amount indicated on line 6 of the worksheet. The court is not required to average Julie's self-employment income, and we note her testimony that her self-employment income for 2011 was zero. For the foregoing reasons, an abuse of discretion in the calculation of Jeffrey's child support obligation is not demonstrated.

{¶ 44} In his next subheading, Jeffrey asserts that a motion was filed on his behalf on April 11, 2011, regarding a Disney time share owned by the parties at the time of their divorce, and that the magistrate and trial court failed to rule on the motion. According to Jeffrey, pursuant to the parties' divorce decree, Julie was required to title the timeshare in her name and failed to do so. Jeffrey seeks permission to sell the time share. Jeffrey's arguments regarding the time share were not raised before the magistrate and are not properly before us, and we note that the alleged April 11, 2011 motion is absent from the record.

{¶ 45} In his next subheading, Jeffrey asserts that the Main Street Hair Salon was improperly valued at the time of the parties' divorce, and that he accordingly suffered "property loss." Again, these arguments are not properly before us. Jeffrey's next subheading is addressed to the actions of his attorney and counsel for Julie in the course of the parties' divorce and we do not reach these arguments.

{¶ 46} Finally, in his final subheading, Jeffrey again asserts that he has been "subjected to gender bias, prejudice and discrimination," and he "requests the Ohio Task Force on Family Law and Children have access to information/data from the Montgomery

County Domestic Relations Court for the past ten (10) years that shows which parent received legal custody of, and place of residence for, the children by gender, race and income level of the parents." This Court has jurisdiction to affirm, modify or reverse the decision of the domestic relations court. While it is unclear what specific relief Jeffrey is requesting in this subpart, there is nothing in the record before us that supports a finding of gender bias, prejudice or discrimination.

{¶ 47} Since Jeffrey was not denied due process of law, and since the domestic relations court did not abuse its discretion in terminating the parties' shared parenting plan, increasing Jeffrey's parenting time and decreasing his child support obligation, the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies mailed to:

Jeffrey Wuich
Julie Wuich
Hon. Denise L. Cross