[Cite as *Miller v. Hunter*, 2015-Ohio-3377.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| KRISTA L. MILLER fka HUNTER | : | |
| | : | |
| Plaintiff-Appellant | : | C.A. CASE NO. 26545 |
| | : | |
| v. | : | T.C. NO. 07DR991 |
| | : | |
| SHANNON D. HUNTER | : | (Civil Appeal from Common Pleas |
| | : | Court, Domestic Relations) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___21st___ day of ____August____, 2015.

. . . . . . . . . .

BRIAN A. SOMMERS, Atty. Reg. No. 0072821, 130 West Second Street, Suite 840, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellant

SHANNON D. HUNTER, 246 N. Third Street, Tipp City, Ohio 45371
        Defendant-Appellee

. . . . . . . . . . . .

FROELICH, P.J.

{¶ 1} Krista Miller (formerly known as Hunter) appeals from a judgment of the Montgomery County Court of Common Pleas, Domestic Relations Division, which granted the parties' motions to terminate their shared parenting arrangement and designated Shannon Hunter, Ms. Miller's former husband, as the residential and custodial

parent of their two minor children.

{¶ 2} For the following reasons, the judgment of the trial court will be affirmed.

{¶ 3} Ms. Miller and Mr. Hunter married in 1998 and divorced in 2008. They have two sons, who were born in 2000 and 2003 respectively. Ms. Miller was named the residential and custodial parent at the time of the divorce. In January 2012, the parties entered into a shared parenting agreement.

{¶ 4} In 2013, both parents filed motions to terminate the shared parenting agreement, which equally divided the children's time with the parents. The magistrate held a hearing on the parties' motions in October 2013 and February and March 2014. In his decision, the magistrate terminated the shared parenting arrangement and named Mr. Hunter the residential and custodial parent. Ms. Miller filed objections. On December 12, 2014, the trial court overruled Ms. Miller's objections and adopted the magistrate's decision naming Mr. Hunter as the residential and custodial parent. It awarded Ms. Miller visitation in accordance with the court's standard order, except that the midweek visitation was extended to an overnight visit. Ms. Miller was also ordered to pay child support.

{¶ 5} Ms. Miller appeals, raising two assignments of error.

*Termination of Shared Parenting*

{¶ 6} R.C. 3109.04 permits a court to modify a decree allocating parental rights, R.C. 3109.04(E)(1), and to terminate a shared parenting decree, R.C. 3109.04(E)(2)(c). Generally, to modify parental rights, the court must first find that there has been a change in circumstances. R.C. 3109.04(E)(1)(a). But a change in circumstances is not required before terminating shared parenting; "nothing in R.C. 3109.04(E)(2)(c) requires the trial

court to find a change of circumstances in order to terminate a shared parenting agreement." *Curtis v. Curtis*, 2d Dist. Montgomery No. 25211, 2012-Ohio-4855, ¶ 7, citing *Brennaman v. Huber*, 2d Dist. Greene Nos. 97 CA 53 and 94 DR 0058, 1998 WL 127081, * 2 (Mar. 20, 1998). To terminate shared parenting, the statute requires only " 'that the court find that it is in the best interests of the minor child.' " *Toler v. Toler*, 2d Dist. Clark No. 10-CA-69, 2011-Ohio-3510, ¶ 11, quoting *Beismann v. Beismann*, 2d Dist. Montgomery No. 22323, 2008-Ohio-984, ¶ 8.[1]

{¶ 7} Pursuant to R.C. 3109.04(E)(2)(c), a court may terminate an order of shared parenting upon the request of one or both of the parents or when "it determines that shared parenting is not in the best interest of the children." In determining the best interest of a child, the court must consider all relevant factors, including, but not limited to: the wishes of the child's parents regarding the child's care; if the court has interviewed the child in chambers, the wishes and concerns of the child as expressed to the court; the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; the child's adjustment to the child's home, school, and community; the mental and physical health of all persons involved in the situation; the parent more likely to honor and facilitate court-approved parenting time or visitation and companionship rights; whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor; whether either

---

[1] *See also Montei v. Montei*, 2d Dist. Clark No. 2013 CA 24, 2013-Ohio-5343, ¶ 26 and fn. 2, observing that we "have previously followed [*Fisher v.*] *Hasenjager* [116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546]'s holding that a modification of the residential parent in a shared parenting decree requires a finding of a change of circumstances as well as a finding that it is in the child's best interest, * * * whereas a termination of shared parenting requires only a best interest analysis." (Citations omitted.)

parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court; and whether either parent has established a residence, or is planning to establish a residence, outside this state. R.C. 3109.04(F)(1).

{¶ 8} A trial court enjoys broad discretion when determining the appropriate allocation of parental rights and responsibilities. *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Absent an abuse of that discretion, a reviewing court will affirm the custody determination of the trial court. *Id.* Abuse of discretion is a term used to indicate that a trial court's decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 9} We will begin our analysis with Ms. Miller's second assignment of error, which states:

> **Trial court erred in upholding magistrate's decision it was in the children's best interest to terminate the parties' shared parenting plan and for Father to be named custodial and residential parent. The decision was against the manifest weight of the evidence and supporting case law.**

{¶ 10} Ms. Miller contends that the trial court failed to properly consider the factors relevant to a child's best interest, set forth in R.C. 3109.04(F), particularly her sons' medical and educational needs and her "more structured home environment" and stability. She also claims that the trial court gave too much weight to the guardian ad

litem's report and recommendation.

{¶ 11} The evidence presented at the hearing was as follows.

{¶ 12} The parties' parenting time arrangement under the shared parenting agreement was a "two-two-alternate weekend" plan; Ms. Miller had the children from Monday after school until they went to school on Wednesday morning (two nights), Mr. Hunter had the children from Wednesday after school until they went to school on Friday morning (two nights), and the parents alternated weekends. Both parents testified that going back-and-forth during the week was difficult for the boys, who were then 13 and 10 years old.

{¶ 13} Significant sources of friction between the parents included the boys' performance in school and the management and treatment of the younger son's attention deficit hyperactivity disorder (ADHD). A significant amount of the hearing was spent detailing the many medical appointments related to the evaluation of the ADHD, with Ms. Miller claiming that Mr. Hunter did not attend appointments and was not engaged, interested, or effective in managing the ADHD or administering the medication prescribed for the condition.

{¶ 14} Ms. Miller testified that Mr. Hunter was "completely against" medications for ADHD, always "stiff-armed" her if she suggested that the younger son had ADHD or any other learning problems, and prioritized the children's football practices over medical appointments. When asked whether she had tried to schedule medical appointments outside of Mr. Hunter's work hours, Ms. Miller responded that Mr. Hunter had a lot of flexibility with his schedule. She stated that she had not discussed school evaluations and standardized test results with Mr. Hunter because she believed that doing so would

lead to a fight.

{¶ 15} Mr. Hunter asserted that Ms. Miller scheduled medical and counseling appointments for the children without any consultation with him and without attempting to accommodate his work schedule, and that she refused to have any meaningful conversation with him about the boys' learning difficulties, alternative treatments for ADHD, or side-effects from the medication. He testified that he agreed with the younger son's diagnosis of ADHD and found the medication to be beneficial. He further testified that he did effectively manage the medication and provide it to the school, with the exception of one occasion when he marked his calendar improperly and the medicine ran out. Mr. Hunter was critical of Ms. Miller's insistence that the daily medication be administered by the school nurse during the week (due to her distrust that Mr. Hunter would administer it), noting that by the time it was administered and took effect, the child had already had one or two classes each day.

{¶ 16} The parties also disagreed about where the children should go to school. Pursuant to the shared parenting agreement, the children attended a particular parochial school. Mr. Hunter wanted them to continue at this school and, according to the guardian ad litem, the boys also wanted to stay there. However, since she had recently moved to a different community in the Dayton area, Ms. Miller had wanted the boys to attend the public schools in that community. The only reason cited by Ms. Miller for the change was that the school in that community was a "Blue Ribbon" school. Mr. Hunter expressed his belief that the proposed change was a matter of convenience to Ms. Miller, because her partner's children went to that school and the boys would be able to ride the bus there, whereas they had to be driven to their current school. According to Mr.

Hunter, when he attempted to discuss the pros and cons of the schools with Ms. Miller, she said "we'll discuss it in court."

{¶ 17} Both parties expressed frustration in dealing with the children's learning difficulties and completion of assignments due to the parents' poor communication and the manner in which the boys switch from house to house during the week. Each party blamed the other for the difficulties in keeping track of the boys' assignments and whether work had been completed. Both parents and the younger boy's teachers participated in an "intervention," during which they developed a plan for improving the parents' involvement in the boy's performance, such as a system for keeping the boy's assignments in a backpack that he took from house to house, but Mr. Hunter testified that Ms. Miller did not follow through on the plan.

{¶ 18} Ms. Miller testified that she lives with her partner and two of her partner's children, that they have been together for several years, and that they have stable housing, having lived in only two places over several years. By contrast, she stated that Mr. Hunter had many relationships and residences during the same period. Ms. Miller stated that her primary communication with Mr. Hunter was through a computer program called MyFamilyWizard, which allows both parents to log in and post the children's activities and other communications; the parties also exchanged occasional emails and texts. Ms. Miller expressed concern that Mr. Hunter prioritized football over school work.

{¶ 19} Mr. Hunter denied Ms. Miller's assertion that he prioritized football over academics. He testified that he did not force the boys to play football, but that he encouraged extracurricular activities generally. Mr. Hunter also expressed concerns about the chaotic environment at Ms. Miller's house (as noted by the guardian ad litem),

and in particular the children's discovery of marijuana in her house. He testified that he did not want his sons to have access to illegal substances that could harm them or get them into trouble, and that he wanted "more diligence" on Ms. Miller's part with respect to the access to marijuana.

{¶ 20} Finally, with respect to communication, Mr. Hunter testified that MyFamilyWizard was "probably being used for the opposite purposes of what it's intended," because Ms. Miller uses it to technically comply with communication about doctor's appointments and the like, but actively avoids genuine discussions about important issues facing the children. Mr. Hunter also testified that Ms. Miller did not comply with the shared parenting agreement over school holidays (Thanksgiving and Christmas) the previous year, such that she had a very disproportionate amount of time with the boys.

{¶ 21} In his testimony and his report, the guardian ad litem stated that it would be very difficult for these parents to cooperate in a shared parenting arrangement. There had been little cooperation between the parents in recent years over the children's school performance or medical issues, particularly with respect to the younger child, who struggles more in school. The parties' parenting styles, rules and expectations are very different, making it difficult for the children to go back and forth between the households. According to the guardian ad litem, school personnel, the guardian ad litem, and even the older child recognized that the situation would probably improve if only one person was in charge of decision-making.

{¶ 22} Both children complained to the guardian ad litem about "drama" created by Ms. Miller with respect to the parenting and times when she would cause embarrassment

by making a scene with Mr. Hunter at one of the child's activities. The guardian ad litem stated that the children expressed a desire to live with and have more time with their father, although they continued to want time with their mother. The guardian ad litem believed the boys' relationship with their father was stronger. Regardless of whether shared parenting was terminated, the guardian ad litem recommended a modification of the parenting arrangement to eliminate the amount of "back and forth" for the children.

{¶ 23} The children expressed to the guardian ad litem a strong connection with and desire to stay at their current school, but Ms. Miller was intent on switching them to her new community's schools because those schools are "Blue Ribbon" schools. School personnel expressed to the guardian ad litem that, in their interactions with Ms. Miller, they felt more like she was gathering "ammunition" to justify a change of school in the future than to address the children's current issues with school.

{¶ 24} Mr. Hunter and Ms. Miller expressed some disagreement to the guardian ad litem about using medication to address the younger son's ADHD, but the guardian ad litem opined that the problem was not so much a disagreement about the need or usefulness of the medication as it was that Mr. Hunter had not been included in the evaluation process or in conversations with the doctors about the treatment. Ms. Miller sent the medication to Mr. Hunter's house with instructions to administer it, but Mr. Hunter was reluctant to do so without additional information, which resulted in obtaining a second opinion. The teachers reported to the guardian ad litem that they had not seen any notable difference in performance by the child since the medication began or based on which parent had had the children the previous night, although the younger child reported being tired after sleeping on the floor at his mother's house.

{¶ 25} The guardian ad litem also reiterated the parents' disagreement about the children's extracurricular activities. Mr. Hunter thought that the activities, particularly football, were important, whereas Ms. Miller threatened to curtail the activities due to unacceptable performance at school. Some letters submitted to the guardian ad litem on behalf of Mr. Hunter indicated that Ms. Miller had, on occasion, behaved disruptively at the children's sports events, "humiliating [Mr. Hunter] and the children."

{¶ 26} The guardian ad litem stated that, in his opinion, termination of the shared parenting arrangement was in the children's best interest, and recommended that custody be awarded to Mr. Hunter. The recommendation was based in large part on the children's preference to live with Mr. Hunter and to stay at their current school. The guardian ad litem further recommended that, if shared parenting were not terminated, the parenting schedule nonetheless be adjusted such that Ms. Miller's parenting time would be reduced, because of the "adverse effects" that the "current equal parenting arrangement" was having on the children.

{¶ 27} Both parties called several additional witnesses at the hearing. On behalf of Ms. Miller, Mr. Hunter's then-wife, with whom he was in divorce proceedings, testified that she had provided much of the care for the children when they were in Mr. Hunter's custody, that he drank alcoholic beverages while the children were in his care, and that he questioned the diagnosis of and use of medication for the younger son. Ms. Miller's sister testified that she (the sister) interacted with the children almost daily, that the boys were bonded to their mother, her partner, and the partner's children, and that she had concerns about the lack of supervision of the children in Mr. Hunter's home.

{¶ 28} On behalf of Mr. Hunter, two parents of friends of the boys, who knew Mr.

Hunter well through football coaching and social activities over several years, testified to his close relationships with the boys and his appropriate parenting. One mother testified that the older son was very mature and responsible and that she had had no concerns about her own son's many sleepovers at Mr. Hunter's house. She testified that the boys were well-cared for by Mr. Hunter; she had heard the older boy complain of "too much yelling" at Ms. Miller's house and not liking to go there. She had also seen Ms. Miller have verbal altercations with her partner at the children's football games, and observed that the boys seem happier after school on the days that they were going to Mr. Hunter's house.

{¶ 29} A football coach of the older son testified that Mr. Hunter had shown "nothing but love and respect for his children" in the interactions he had observed. He described the older boy as an "old soul" who was very mature. He stated that the boy was sometimes outgoing and sometimes down, and that Ms. Miller's occasional threats to withdraw him from football definitely changed his attitude on the field. The coach also observed that the older boy was late and/or unprepared with the necessary equipment when Ms. Miller brought him to practice, but that these problems did not exist when Mr. Hunter brought him.

{¶ 30} The trial court found that Ms. Miller's assertions about Mr. Hunter's denial of or disinterest in the children's medical care were contradicted by the evidence and that she had contributed to Mr. Hunter's limited involvement in their medical care. The court did not credit Ms. Miller's assertions that Mr. Hunter did not accept the ADHD diagnosis for the younger boy or would not appropriately manage his medication. Although it recognized that the children struggled somewhat in school, the court concluded that the

manner in which Ms. Miller interacted with their current school contributed to her belief that they should switch schools.

{¶ 31} The trial court noted the children's feelings, as expressed by the guardian ad litem and the father, that they (the boys) were treated differently than Ms. Miller's partner's children at their mother's house, that there was a lot of "drama" at Ms. Miller's house, and that through unpreparedness or disruptive behavior toward Mr. Hunter, Ms. Miller had created awkward and/or disadvantageous situations with respect to the boys' extracurricular activities. The children did not want to change schools (a change for which Ms. Miller had advocated) and did not want to spend more time with Ms. Miller at the expense of time with Mr. Hunter. Based on past interference with court-ordered visitation on holidays, the court concluded that Mr. Hunter was more likely than Ms. Miller to facilitate parenting time.

{¶ 32} The trial court concluded that the children love both their parents, but it found "compelling" the guardian ad litem's determination that "[t]he children's relationship with their Father is stronger and each of the children independently asserted their desire to live primarily with him." Mr. Hunter "creates less stress," meets the children's medical and other needs, and intends to keep them in their current school, all of which were in the children's best interest. The court also concluded that Ms. Miller had "offer[ed] no overwhelming justification for forcing the children to change schools."

{¶ 33} Based on the evidence presented, the trial court did not abuse its discretion in concluding that it was in the children's best interest to terminate the shared parenting arrangement, to name Mr. Hunter as the residential and custodial parent, and to award visitation with Ms. Miller according to the court's standard order, with the modification that

the weekly mid-week visit be an overnight visit.

**{¶ 34}** Ms. Miller's second assignment of error is overruled.

**{¶ 35}** Ms. Miller's first assignment of error states:

**The court erred by not finding terminating the shared parenting agreement was in the children's best interest.**

**{¶ 36}** Ms. Miller's objection under this assignment is apparently that the court did not separately state that termination of the shared parenting agreement was in the best interest of the children, before proceeding to consider (again under a best interest analysis) which parent should be the residential and custodial parent. There is no dispute that the trial court terminated the shared parenting plan.

**{¶ 37}** As discussed above, termination of a shared parenting plan is governed by R.C. 3109.04(E)(2)(c), which provides as follows: "The court may terminate a prior final shared parenting decree that includes a shared parenting plan approved under division (D)(1)(a)(i) of this section upon the request of one or both of the parents *or* whenever it determines that shared parenting is not in the best interest of the children." (Emphasis added.)

**{¶ 38}** Based on this language, we question whether a trial court must always find that the termination of shared parenting is in the children's best interest; the language of the statute is in the disjunctive and seems to allow for termination based solely on one or both of the parents' request for such a change. (Here, both parents sought to terminate shared parenting.) Such an interpretation is consistent with the prior holdings of this court and other courts which recognize that shared parenting is generally unfeasible if cooperation between the parents is lacking. *See, e.g., Wuich v. Wuich*, 2d Dist.

Montgomery No. 25481, 2013-Ohio-956, ¶ 30; *Brandt v. Brandt*, 11th Dist. Geauga No. 2012-G-3064, 2012-Ohio-5932, ¶ 19; *Beismann*, 2d Dist. Montgomery No. 22323, 2008-Ohio-984, ¶ 44; *see also* R.C. 3109.04(F)(2)(a) (listing the "ability of the parents to cooperate and make decisions jointly, with respect to the children" as a factor in determining whether shared parenting is in the best interest of the children).

{¶ 39} We have also observed that parents' views that shared parenting is not working or a lack of cooperation between the parents is difficult to separate from an anaylsis of a child's best interest. "As a practical matter, of course, when a parent wants shared parenting terminated and refuses to cooperate, it is difficult to imagine continuation of shared parenting being in the children's best interest." *Beismann* at ¶ 44, quoting *Goetze v. Goetze*, 2d Dist. Montgomery No. 16491, 1998 WL 136164 (Mar. 27, 1998).

{¶ 40} Although the trial court did not expressly state a finding that termination of the shared parenting plan was in the children's best interest, such a finding was implicit in the trial court's statement that, "[g]iven the parties' struggle to communicate or agree on what is in the children's best interest, the Court agrees that shared parenting is not appropriate in this situation." The court did not abuse its discretion in reaching this conclusion.

{¶ 41} The first assignment of error is overruled.

{¶ 42} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Brian A. Sommers
Shannon D. Hunter
Hon. Denise L. Cross